**PAYNE, Director General of Railroads, et al. v. BASSETT.　(No. 1249.)**

(Court of Civil Appeals of Texas. El Paso. Nov. 23, 1921. Rehearing Denied Dec. 15, 1921.)

1. **Commerce** ⬗16—**Power to regulate embraces instrumentalities, agencies, and means by which carried on.**

The power to regulate interstate commerce extends and applies, not only to commerce itself, but embraces all the instrumentalities, agencies, and means by which such commerce is carried on. (Per Walthall, J.)

2. **Statutes** ⬗217—**Congressional committee's report may be looked to in construing statute.**

In considering the importance and necessity of fixed rates for interstate transportation as respects liability of a carrier for loss of goods for which no rate has been filed or published, the court may look to the report of a committee of Congress in recommending a bill amending the Interstate Commerce Act. (Per Walthall, J.)

3. **Carriers** ⬗147—**Provision of tariff and bill of lading against transportation of certain articles and as to limitation of liability therefor not contrary to statute.**

A provision in a carrier's tariff of rates as filed, published, and approved by the Interstate Commerce Commission that certain articles, including precious metals or articles manufactured therefrom, will not be accepted for shipment and a provision of such carrier's bill of lading, providing that articles not specifically rated would not be carried, and that the carrier would not be liable therefor unless a special agreement and stipulated value was indorsed thereon, though amounting to rules and regulations, are not forbidden by the Carmack Amendment to the Interstate Commerce Act as amended by Act March 4, 1915, and Act Aug. 9, 1916 (U. S. Comp. St. §§ 8592, 8604a), making interstate carriers liable for loss, damage, or injury, and prohibiting contracts, receipts, rules, or regulations, etc., exempting carriers from such liability, especially in view of the further provision of that amendment that it should not apply to property concerning which the carrier should be expressly authorized or required by the Interstate Commerce Commission to maintain rates dependent on declared value. (Per Walthall, J.)

4. **Carriers** ⬗30 — **Not authorized to receive goods for which no rate is fixed, filed, or published.**

Under U. S. Comp. St. § 8569, par. 7, providing that no carrier shall engage in the transportation of passengers or property unless its rates, fares, and charges have been filed and published in accordance therewith, where a carrier had made no rate for the transportation of solid silverware, and hence none had been filed or published, it was not authorized to receive such property for shipment by freight.

5. **Carriers** ⬗112 — **Not liable for loss of property for which no rate was filed or published.**

As a contract for the transportation by an interstate carrier of solid silverware for which no rate had been made, filed, or published was unlawful and illegal under U. S. Comp. St. § 8569, par. 7, the carrier was not liable for the loss of such property. (Per Walthall, J.)

6. **Carriers** ⬗108—**Statute as to liability does not apply to property which carrier is not authorized to transport.**

U. S. Comp. St. § 8604a, making interstate carriers liable for loss, damage, or injury to property, applies only to property lawfully received for transportation, and not to property received for transportation in violation of section 8569, par. 7, forbidding the transportation of property unless the rates, fares, and charges have been filed and published. (Per Higgins, J.)

7. **Carriers** ⬗112—**Recovery may be had for property received for transportation in violation of law.**

A contract by an interstate carrier for the transportation of property, such as solid silverware, for which no rate has been made, filed, or published, though unlawful, is not immoral, and, while there can be no recovery upon the con-

tract of transportation, liability may be established independent of the contract if the facts bring the case within the rule authorizing relief to a person parting with property or money on the faith of an unlawful contract. (Per Higgins, J.)

Harper, C. J., dissenting.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Action by J. M. Bassett against John Barton Payne, Director General of Railroads, as Federal Agent, and another. From a judgment for plaintiff, defendants appeal. Reversed and remanded.

Beall, Kemp & Nagle, of El Paso, for appellants.

Jones, Jones, Hardie & Grambling, of El Paso, for appellee.

WALTHALL, J. This is a suit by J. M. Bassett against the Galveston, Harrisburg & San Antonio Railway Company, and John Barton Payne, Director General, as Federal Agent of Railroads, to recover the value of a box of cut glass and silverware, shipped by J. M. Bassett from Dryden, Tex., to Chicago, Ill., on or about the 2d day of March, 1918. Appellee alleged that appellant was a common carrier for hire of goods, wares, and merchandise, and that on the day mentioned he delivered to the Galveston, Harrisburg & San Antonio Railroad Company, among other things named, one box containing cut glass and silverware, listed by appellant as "one box of cut glass," for the purpose of being transported by said railroad company and its connecting carriers, from Dryden, Tex., to Chicago, Ill.; that defendant, for the consideration paid undertook to safely transport and deliver in good condition said goods from Dryden, Tex., to Chicago, Ill.; that the agent of appellant, at the time said goods were delivered to him and at the time the bill of lading was issued, was notified and informed of the exact contents of the box, that the box listed by appellant as "one box of cut glass" contained not only cut glass, but also contained a considerable quantity of silverware. Appellee alleged that appellant has never delivered said goods to him or to his agent at Chicago, and now refuses so to do. Appellee itemized the contents of said box, the value of each item, and alleged their reasonable market value, and their actual value at Chicago, had appellant complied with its contract, to be $517. Appellee further alleged that by reason of the failure of appellee to comply with its agreement to safely transport and deliver said goods at Chicago appellee suffered damages in the sum of $517.

Appellant answered by general demurrer, special exception because said petition showed that a large part of said shipment consisted of solid silverware; alleged to have been shipped by freight, and in so far as same sought to recover for the value of the solid silverware same stated no cause of action, in that the court judicially knows that there were promulgated rules, regulations, and schedules duly filed by the Interstate Commerce Commission and approved by it, under the terms of which precious metals and articles manufactured therefrom could not be accepted as freight. Appellant also entered a general denial, and specially pleaded that a large part of said shipment consisted of solid silverware, and that at the time of delivery of said shipment to the carrier there was and had been duly filed with the Interstate Commerce Commission rules and schedules which were and had been duly approved by them, which, among other things, provided that:

"Unless otherwise provided, the following property will not be accepted: Bank bills, * * * precious metals or articles manufactured therefrom"

—and alleged various articles enumerated in appellee's petition, for which recovery was sought, were articles manufactured from precious metals, and that there was no provision authorizing the shipment of articles manufactured from precious metals, or precious metals themselves, by freight.

The case was tried without a jury, resulting in a judgment in favor of appellee in the sum of $517. The court made and filed findings of fact and conclusions of law. It was agreed by counsel for both parties that the Galveston, Harrisburg & San Antonio Railway Company, at the time of the shipment in question, was being operated by the government, through the Director General; that gold and silver are precious metals, and that the freight charge on the goods from Dryden to Chicago was paid by appellee.

The court found: That appellee was the owner of the articles of property described in the petition; that the articles of property were delivered to said railway company then acting under the Director General of Railroads of the United States of America, and were therefore delivered to the United States Railroad Administration for through shipment to appellee's agent as consignee at Chicago, Ill.; that the Director General received said articles of property, and was fully advised at the time of receiving them of their nature and character, and agreed to transport said articles as freight from the place of origin to their destination; that said articles were of the reasonable value, both at Chicago and at Dryden, Tex., of $517; that by "solid silver," as used in the petition, is meant what is commonly known as solid silver, and commonly used by persons generally in their homes as silverware for use on their tables, and such as would be generally transported for personal use, from one place to another, within the United States, and

does not mean by said term "solid silver" that said articles were made entirely of silver; that said articles were misplaced or lost by appellant after same had been received by appellant and taken into custody and placed in the cars for transportation; that said articles were never delivered to appellee or his agent; that appellant failed to show on the trial what became of the articles after same were delivered by appellee and received by appellant for shipment; that said articles were shipped upon a bill of lading approved by the Interstate Commerce Commission as to form, but that the bill of lading was filled out by appellant's agent after being fully advised of the nature of said goods. The court concluded, as matter of law, that appellant is liable to appellee for the said value of said articles, and so entered judgment.

Appellant presents five assignments of error, with several additional propositions. The first assignment suggests error in rendering judgment for appellee. The several propositions under the first assignment are to the effect: There being no schedule or tariff filed with or approved by the Interstate Commerce Commission for the transportation of freight of what is commonly known as solid silverware, the court erred in rendering judgment for the value of solid silverware; that paragraph 7 of section 6 of the Interstate Commerce Act (U. S. Comp. St. § 8569, par. 7), providing that no carrier shall engage or participate in the transportation of property unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with said provision of said act, it was error to render judgment for the value of said silverware when no rates therefore were filed or published; that paragraph 7 of section 6 of the Interstate Commerce Act providing that no carrier shall extend to any shipper or person any privileges or facilities for the transportation of property except such as are specified in such tariffs, it was error to render judgment against the defendant for the value of the silverware when no tariff was specified in the shipment of same; that in rendering judgment for the value of the silverware the court in effect created undue discrimination in favor of the shipper as against other shippers. Assignments 2, 3 and 4 present practically the same question, insisting that the court was in error in the conclusions of law that no regulation of the Interstate Commerce Commission with reference to tariffs and no approval of tariffs by the Commission can be of any avail under the law to relieve appellant from such liability. We think the first four assignments can be considered together.

The questions raised by assignments and the propositions thereunder present questions of law and not of fact. Can the judgment of the court awarding damages for the value of the silverware be sustained where the law, as in paragraph 7, section 6, Carmack Amendment to the Interstate Commerce Act, provides that no carrier shall extend to the shipper any privilege or facilities for the transportation of property, and where the tariffs filed with and promulgated by and approved by the Interstate Commerce Commission in force at the time of the shipment in question provide that, "Unless otherwise provided the following property will not be accepted; precious metals or articles manufactured therefrom," and in the absence of any rate or tariff providing for the shipment of the silverware, same being articles manufactured from silver with a mixture of alloy.

It will be observed that appellee was not seeking to have the silverware shipped, nor to recover damages for the failure to ship the silverware, that is, he was not seeking to compel the performance of the service of the shipment, nor to secure damages for failure to perform the service of the transportation of the silverware, nor was the suit to recover for the loss of the goods by reason of negligence of the appellant as a warehouseman, but the suit is for damages for the loss or conversion of goods actually received by appellant under a contract for shipment and actually shipped, but lost in shipment, or converted.

The defense under the several assignments is based upon the propositions above set out, and briefly to the effect that, in the absence of a schedule or tariff for the transportation of the silverware, and the inhibition in paragraph 7 of section 6 of the Interstate Commerce Act that no carrier shall engage or participate in the transportation of property, or extend to the shipper the privilege for property not specified in such published and filed schedules, in the absence of rate charges filed and published in accordance with the said act, there could be no liability of the carrier, and the judgment of the court is error.

Appellee's counter propositions to each of the assignments is to the effect that, the goods in question having been received by the railroad for transportation under a contract of carriage, and the carrier having failed to account for or make delivery of the goods, liability arose by reason thereof for the loss, notwithstanding the above regulation by the Interstate Commerce Commission, and regardless of the fact that no tariff rate was in force for silverware.

Appellee further suggests that section 20, subdivision (a) K, of the Interstate Commerce Act, as amended by act of August 9, 1916 (U. S. Comp. St. § 8604a) establishes the liability of the carrier.

It is the contention of appellants that the following cases establish the nonliability of

appellants: Boston & M. R. Ry. Co. v. Hooker, 233 U. S. 97, 34 Sup. Ct. 526, 58 L. Ed. 868, L. R. A. 1915B, 450, Ann. Cas. 1915D, 593; Galveston, Harrisburg & S. A. Ry. Co. v. Woodbury, 254 U. S. 357, 41 Sup. Ct. 114, 65 L. Ed. 132; Texas & Pacific Ry. Co. v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011. Space forbids a review of the holding of the holding of the court in the cases. We have concluded however, that the matters decided in the above cases do not present the same question presented here. And some of the issues there discussed are doubtful of application if not eliminated by subsequent amendments of the Interstate Commerce Act. In none of the cases cited do we find discussed the question as to the liability as a carrier in interstate shipments, where property has been received by the carrier for shipment, and where the Interstate Commerce Commission has, by its published rules or regulations, either expressly inhibited the transportation by freight of such property, or where no tariff rate has been fixed by the Commission for the transportation by freight of such specified property, and the property has been received by the carrier for shipment, under a contract of shipment, and actually shipped. In each of the cases referred to, as we construe them, there was a tariff rate on file with the Interstate Commerce Commission.

It is not our purpose to discuss the validity of the Interstate Commerce Act. Section 8 of Article 1 of the Constitution of the United States provides:

"The Congress shall have the power * * * to regulate commerce with foreign nations, and among the several states, and with the Indian Tribes."

It has been held that the power to regulate interstate commerce granted to Congress, as above, includes both regulation and prohibition. Hoke v. United States, 227 U. S. 308, 33 Sup. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905; Hipolite Egg Co. v. United States, 220 U. S. 45, 31 Sup. Ct. 364, 55 L. Ed. 364.

[1] The power to regulate has been defined as embracing the power to prescribe the rules by which commerce shall be governed, that is, the conditions upon which interstate commerce shall be conducted. Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679; Interstate Commerce Commission v. Brimson, 154 U. S. 447, 14 Sup. Ct. 1125, 38 L. Ed. 1047. The power to regulate interstate commerce not only extends and applies to commerce itself, but embraces all the instrumentalities, agencies, and means by which such commerce is carried on. Southern R. Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72, and cases referred to.

[2] In considering the importance and necessity of fixed rates for interstate transportation, we think we may look to the report of the Cullom Committee to Congress in recommending the Cummins Bill, which later became an amendment to the Interstate Commerce Act. The committee said, in part:

"One of the chief purposes of any legislation for the regulation of interstate commerce should be to secure the fullest publicity, both as to charges made by common carriers and as to the manner in which their business is conducted. The business of a common carrier concerns practically the whole public, and the carrier exercises in some respects a public function. * * * It is agreed by all who have given the subject of railroad regulation attention that the maintenance of stable and reasonable uniform rates is of the first importance, and greatly to be desired. Neither (reasonable and equitiable charges) result, it is also agreed, can be secured without publicity, which is the surest and most effective preventive of unjust discrimination."

The purpose of Congress in the enactment of the provisions of section 6 of the Hepburn Act, amending the original Interstate Commerce Act, was to prohibit carriers from receiving a greater or less or different compensation than the rate on file, adding the words "or different." Louisville & N. R. Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671. In that case the court said:

"But the act of June 29, 1906, made a material addition to the words of the act of 1887; for it expressly prohibited any carrier, unless otherwise provided, to demand, collect, or receive 'a greater or less or different compensation' for the transportation of persons or property, or for any service in connection therewith, than the rates, fares and charges specified in the tariff filed and in effect at the time. We cannot suppose that this change was without a distinct purpose on the part of Congress. The words 'or different,' looking at the context, cannot be regarded as superfluous or meaningless. We must have regard to all the words used by Congress, and as far as possible give effect to them. Market v. Hoffman, 101 U. S. 112, 115. The history of the acts relating to commerce shows that Congress, when introducing into the act of 1906 the word 'different,' had in mind the purpose of curing a defect in the law and of suppressing evil practices under it by prohibiting the carrier from charging or receiving compensation except as indicated in its published tariff [giving references]. In our opinion, after the passage of the commerce act, the railroad company could not lawfully accept from Mottley and wife any compensation 'different' in kind from that mentioned in its published schedule of rates."

It has uniformly been held by the Supreme Court, as provided in paragraph 7 of article 8569, U. S. Compiled Statutes 1918, that no carrier, unless otherwise provided by statutes, is permitted to engage or participate in the transportation of passengers or property as defined in the act, unless the rates, fares, and charges upon which the same are trans-

ported have been filed and published in accordance with the provisions of the act. Cincinnati, N. O. & T. T. Ry. Co. v. Rankin, 241 U. S. 319, 36 Sup. Ct. 555, 60 L. Ed. 1022, L. R. A. 1917A, 265; Tex. & Pac. R. Co. v. American T. & T. Co., 234 U. S. 138, 34 Sup. Ct. 885, 58 L. Ed. 1255; Santa Fé P. & P. R. Co. v. Grant Bros. Const. Co., 228 U. S. 177, 33 Sup. Ct. 474, 57 L. Ed. 787.

Appellant introduced in evidence, in connection with the evidence of witness Jonz, the rates and tariffs that were in effect in March, 1918, at the time of the shipment in controversy. The tariff introduced was the tariff authorized by the Interstate Commerce Commission, specifying the classification under which every shipment was to move, and the rules pertaining to the handling of such shipments. The rates and tariffs introduced were contained in a book. The book was shown to be Western Classification No. 55, issued by the Western Classification Committee, the tariff authorized by the Commission, and applying at the date of this shipment. The rates and tariffs thus shown are the only rates and tariffs appearing in the evidence. Rule 36 of the book reads:

"Unless otherwise provided the following property will not be accepted: Bank bills, coin or currency, deeds, notes or valuable papers of any kind, jewelry, postal or revenue stamps, precious metals or articles manufactured therefrom, precious stones."

It was shown by the evidence that the above-quoted rule was the rule that regulated freight shipments. It was also shown that there was an exception on plated silverware not otherwise indicated by name, in boxes, and for which a tariff was provided. The bill of lading and tariff issued was, as to form, authorized by the Interstate Commerce Commission. It reads:

"No carrier will carry or be liable in any way for any document, specie, or for any articles of extraordinary value not specifically rated in the published classification or tariffs, unless a special agreement to do so and a stipulated value of the articles are indorsed hereon."

The record does not show a special agreement or stipulated value.

Appellee insists that the Carmack Amendment to the Interstate Commerce Act as modified by the first and second Cummins Amendment, Acts of March 4, 1915, and August 9, 1916 (U. S. Comp. St. §§ 8592, 8604a), fixes the liability of appellant, notwithstanding the above tariff rules and regulations, and regardless of the fact that there was no tariff filed with or promulgated by the Interstate Commerce Commission covering the shipment of solid silverware, or the silverware involved in this shipment. The Carmack Amendment, as thus amended, now reads as follows:

"That any common carrier, railroad, or transportation company subject to the provisions of this act receiving property for transportation from a point in one state * * * to a point in another state, * * * shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever, shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one state * * * to a point in another state, * * * shall be liable to the lawful holder of said receipt or bill of lading * * * for the full actual loss, * * * caused by it or by any such common carrier * * * when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void: Provided, however, that the provisions hereof respecting liability for full actual loss, damage, or injury, * * * shall not apply, first, to baggage * * *; second, to property, except ordinary live stock, received for transportation concerning which the carrier shall have been or shall hereafter be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property. * * *" U. S. Comp. St. § 8604a.

Then follow other provisions in the bill, none of which have application to the facts presented here.

[3, 4] The provisions in the bill of lading and tariff schedule, as above, inhibiting the acceptance by carrier for shipment by freight of precious metals or articles manufactured therefrom is a rule and regulation of the Interstate Commerce Commission, and not a part of the law itself other than as the Commission might be empowered by law to prescribe or promulgate such rule or regulation. No law enacted by Congress specifically forbids carriers in interstate commerce from shipping by freight precious metals or articles manufactured therefrom, so that the inhibition found in the book of rules, as above, is purely a tariff regulation prescribed by the Commission, and not a law enacted by Congress. As we have seen above, the carrier in interstate shipments is not permitted by the law to receive any property for shipment by freight unless the tariff rate for such property has been filed with the Commission and published in accor-

dance with the act. The evidence shows that there was no tariff rate for the goods in question, and of course there was none filed or published. It follows that the railroad company, at least for two reasons, was not authorized to receive the goods in question for shipment by freight. It will be observed that the present law as found in the Carmack Amendment, as modified and above quoted, makes the carrier liable for loss caused by it, or its connecting carriers when transported on a through bill of lading, and forbids the carrier to exempt against such loss, "by contract, receipt, rule, regulation or other limitation of any character whatever," then it affirmatively makes the carrier, and the connecting carriers, under the same circumstances liable "for the full actual loss" caused by it, "notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value" in a receipt, bill of lading, contract, rule, regulation or tariff filed, and any such limitation as mentioned is void.

If the above-quoted portion of the Carmack Amendment as thus modified by the Cummins Amendment to the Interstate Commerce Act has application to the facts of this case, we think appellee should recover and the case be affirmed. However, it seems to us that the contract, receipt, rule, regulation, or other limitation against which the above-quoted law forbids the carrier to defend are matters of its own creation or matters of contract between the shipper and carrier, and does not embrace or include the filing and publishing with the Commission the tariff rate which the law enjoins be done. The tariff rate on the property to be shipped, which the law requires to be filed with the Commission and published, is not, it seems to us, purely the contract, receipt, rule, or regulation against which the carrier may not defend. If the contention of appellee is the proper interpretation to be placed on the quoted portion of the Carmack Amendment it would seem that the law requires the filing and publishing of the tariff, and forbids the carrier to receive for shipment the property to which the tariff applies, and at the same time refuse to enforce the law by the provision making the initial carrier and the connecting carriers liable for full actual loss of the property transported, when the required filing and publishing of the tariff on the property received and transported is not made. In such case the law itself would require a thing to be done and at the same time abrogate its own provision by refusing its enforcement. We think such is not the proper interpretation.

Again, we think, that if we are mistaken in the above interpretation of the law, and that the required filing of the tariff is included in the above-quoted portion of the Carmack Amendment, the first-quoted provision in the amendment exempts from the amendment the shipment in question. The first exemption under the provision applies to baggage. The second applies to property, other than live stock, concerning which the carrier is expressly authorized or required by the Commission to establish rates dependent upon the value declared by the shipper, or agreed upon in writing, as the released value of the property. If the law's requirement that the tariff rate must be filed and published and the rate thus fixed by the Commission before a shipment can be received by the carrier is a law provision against which the carrier may not defend when not observed, as insisted upon by appellee, the provision saves the law against its own destruction by saying that the bill shall not apply to property, except live stock, concerning which the carrier is authorized or required by the Commission to maintain a rate based on value. Here the Commission, as provided by the law, has said to the carrier that it shall not receive and transport this property. We think that to harmonize the seeming conflict in the requirement of the law that the carrier shall not accept for transportation any property unless a tariff has been provided therefor, and the above-quoted amendment invoked by appellee, the proper interpretation of the amendment would apply only to contracts, receipts, rules, regulations, or other regulations not prescribed by the law itself, but to such only, if any, as are made by the shipper and carrier and such as are matters of rule or regulation by the Commission, and not a specific requirement of the law.

[5] The question as presented, it seems to us, is not one in which the answer of the carrier is that it exceeded its charter powers, involving only a question of authority to enter into the shipment contract, but one involving the violation of an express provision of law on a specific matter, that is, a contract that is unlawful, illegal, as distinguished from a transaction merely without authority to perform it. Bond v. Terrell C. & W. Mfg. Co., 82 Tex. 309, 18 S. W. 691; Central Trans. Co. v. Pullman Palace Car Co., 139 U. S. 24, 60, 11 Sup. Ct. 478, 35 L. Ed. 55. We might say also that in view of the purpose for which tariff rates are required to be fixed and published by the Interstate Commerce Act the law requiring a fixed and published rate establishes a public policy, and a contract to transport goods by freight expressly forbidden to be so transported and without a rate fixed and published, such transaction would be in contravention of public policy.

The shipment contained $80 worth of goods which the carrier was authorized to ship, for the loss of which appellee was entitled to recover. As we view it, as the case

is presented, such was the extent of the carrier's liability.

We have concluded that the judgment of the trial court should be reversed and remanded.

Reversed and remanded.

HIGGINS, J. I concur in the reversal of this case for the following reasons:

The Interstate Commerce Act provides that—

"No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this Act. * * * See par. 7, of art. 8569, U. S. Compiled Statutes 1918."

Rates and charges for the transportation of solid silverware not having been filed and published, the contract for the transportation of plaintiff's silverware was in violation of the law quoted, and therefore illegal. It was also perhaps in violation of the provisions of the law against undue preferences and illegal on that account.

[6] The proposition relied upon by appellee, as stated in his brief, is that:

"The goods in question having been received by the defendants in the court below, for transportation from a point in Texas to a point in Illinois, and having failed to account for or make delivery of said goods to J. M. Bassett, the owner and shipper, the said defendants became liable to said J. M. Bassett for the full actual loss caused by said defendants, notwithstanding the fact that the tariff in force and approved by the Interstate Commerce Commission had no tariff in force fixing the rates for the shipment of articles manufactured from precious metals."

In support of his position appellee invokes article 8604a, U. S. Compiled Statutes 1918; which provides that:

"Any common carrier, railroad, or transportation company subject to the provisions of this act receiving property for transportation from a point in one state or territory or the District of Columbia to a point in another state, territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever, shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed; and any such common carrier, railroad, or trans-portation company so receiving property for transportation from a point in one state, territory, or the District of Columbia to a point in another state or territory, or from a point in a state or territory to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a territory shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void."

Appellee says that the silverware having been received by the carrier it became liable for its value under the last-quoted act. A literal interpretation of the act perhaps sustains this view, but, in my opinion, it was not intended by Congress to apply, and should not be construed as applying, to property received by a carrier for transportation in violation of other provisions of law. I think it should be construed as applying to property lawfully received for transportation. And the action in this case being based wholly upon the contract of transportation, and since such contract was illegal, an action for the breach thereof cannot be maintained.

[7] The contract in this case, though unlawful, is not in itself immoral, and in cases where a person has parted with property or money on the faith of such an unlawful contract, relief in all instances will not be denied. The rule in such cases is thus stated by Mr. Justice Gray in Central Transportation Co. v. Pullman Palace Car Co.. 139 U. S. 24, 60, 11 Sup. Ct. 478, 488 (35 L. Ed. 55):

"A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms, but on an implied contract of the defendant to return, or, failing to do that, to make compensation for property or money which it has no right to retain. To maintain

such an action is not to affirm, but to disaffirm, the unlawful contract."

Other decisions to the same effect are· Rankin v. Emigh, 218 U. S. 27, 30 Sup. Ct. 672, 54 L. Ed. 915; Citizens' Central National Bank of N. Y. v. Appleton, 216 U. S. 196, 30 Sup. Ct. 364, 54 L. Ed. 443; Logan County National Bank v. Townsend, 139 U. S. 67, 11 Sup. Ct. 496, 35 L. Ed. 107; Aldrich v. Chemical National Bank, 176 U. S. 618, 20 Sup. Ct. 498, 44 L. Ed. 611; Bond v. Terrell Cotton & Woolen Mfg. Co., 82 Tex. 309, 18 S. W. 691.

The present record does not bring the case within the principle announced in the cited cases. The action is based wholly upon the contract of transportation, and the evidence is insufficient to bring the case within rule announced, but upon retrial it may be·that a liability may be shown independent of the illegal contract. I, therefore, concur in reversing and remanding for retrial.

HARPER C. J. (dissenting). Under the holdings in the opinion cited in the concurring opinion and the following cases on liability for loss of baggage, where the articles contained in a trunk or other container are not all personal effects, with notice to the company through its agent of the class of goods in fact in them: Railway Co. v. Miller, 103 Ark. 37, 145 S. W. 889, 39 L. R. A. (N. S.) 634; 2 A. L. R. 110; In re T. H. Bunch Co. (D. C.) 180 Fed. 529—I am of the opinion that the judgment of the trial court should be affirmed.